# Milner, Wood & Wren *v.* Patton.

*Action for Price of Goods sold and delivered.*

*Validity of contract for sale of goods, to be used in aid of military forces of Confederate States.* — An action does not lie, to recover the price of goods sold and delivered by one citizen of this State to another, in October, 1861, if the seller knew, at the time of the sale, that the purchaser intended to use the goods in providing uniforms and clothing for the soldiers engaged in the military service of the Confederate States. (Overruling *Thedford* v. *McClintock*, 47 Ala. 647; SAFFOLD, J., dissenting.)

APPEAL from the Circuit Court of Lauderdale.

Tried before the Hon. JAMES S. CLARK.

This action was brought by the appellants, suing as partners, against Robert M. Patton, to recover the price of goods, wares, and merchandise, sold and delivered by the plaintiffs to the defendant, in October, 1861. The complaint contained

[Milner *v.* Patton.]

only the common counts. The defendant pleaded the general issue, and a special plea, averring that the goods were purchased by him for the purpose of furnishing uniforms and clothing to the soldiers engaged in the military service of the Confederate States, and were so used, and that the plaintiffs had knowledge of this intended illegal use when they sold the goods. To this special plea the plaintiffs replied, " that said goods were not sold and furnished to the defendant with any intention on the part of said plaintiffs of aiding the Rebellion, but were sold to the defendant for his own purposes and uses; and whether the said defendant used said goods in aiding the Rebellion is a matter which ought not to prejudice or defeat plaintiffs' right of recovery, and furnishes no answer to the complaint." The cause was tried on issues joined, but the issues are not definitely shown by the record. On the trial, as appears from the bill of exceptions, the plaintiffs proved that in 1861, and prior to that time, they were engaged in the manufacture of woollen goods in said county, and sold to the defendant, in October, 1861, the goods the price of which was here sued for; that some of the goods were furnished on the defendant's verbal orders, and some on his written orders; that the written orders were generally signed, " R. M. Patton, treas.; " " that the plaintiffs understood that the goods were for the clothing of military companies in the Confederate army; " " that there was in said county, at the time said goods were purchased, a ' Central Military Committee,' whose business was to raise funds, and purchase clothing and supplies for the military companies then organizing in the service of the Confederate States; that the defendant was the treasurer of said committee, and as such purchased said goods. It was in proof, also, that large sums of money were received and paid out by said treasurer, for the purposes aforesaid; and the defendant testified that he bought said goods as the agent and treasurer of said committee, for the purpose of clothing said military companies, and not on his individual account." The plaintiffs asked the court to instruct the jury, " that if the defendant contracted for the goods as treasurer, and had in his hands at any time funds of the committee sufficient to pay said debt, and did not pay it, then he is liable; " which charge the court refused, and the plaintiffs excepted. The court charged the jury, at the instance of the defendant, " that if they believed, from the evidence, that the goods were purchased by the defendant for the purpose of clothing and uniforming Confederate soldiers, then the plaintiffs cannot recover; " to which charge, also, the plaintiffs excepted. The charge given, and the refusal of the charge asked, are the matters now assigned as error.

[Milner *v.* Patton.]

WATTS & TROY, and WOOD & O'NEAL, for the apellants. — 1. The charge given by the court was certainly erroneous. It made the plaintiffs responsible for an intended illegal purpose on the part of the defendant, although they did not participate in it, and had no knowledge of it. *Thedford* v. *Mc-Clintock*, 47 Ala. 647 ; *Tedder* v. *Odom*, 2 Heiskell (Tenn.), 68, cited in 5 Amer. Rep. 25 ; *Naff* v. *Crawford*, 1 Heiskell (Tenn.), 116. These authorities also show that mere knowledge on the part of the plaintiffs of the defendant's intended illegal purpose would not defeat a recovery. To defeat a recovery by the seller, he must actively participate in the illegal qurpose. *Hedges* v. *Wallace*, 2 Bush (Ky.), 442 ; *Randon* v. *Toby*, 11 Howard (U. S.), 520 ; *Kreiss* v. *Seligman*, 8 Barbour, 439 ; *Armfield* v. *Tate*, 7 Iredell, 260 ; *Dater* v. *Earl*, 3 Gray (Mass.), 482 ; Story on Contracts, § 542 ; 1 Parsons on Contracts, 380.

2. The charge asked by the plaintiffs ought to have been given. The proof showed that the defendant, as the treasurer of a military committee, had received large sums of money, to be expended in the purchase of clothing for the soldiers ; and he will not be permitted to plead the illegality of the contract, while retaining the money. No man can take advantage of his own wrong. Broom's Legal Maxims, 544, § 710.

BRICKELL, J. — All contracts, hostile to, or violative of the Constitution or laws, or of the public policy as defined and declared by them, of the United States, are invalid. *Patton* v. *Gilmer*, 42 Ala. 548 ; *Shepherd* v. *Reese*, Ib. 329. The locality of the making of the contract is not material in the operation of this principle, if enforcement is sought in a court having for its supreme law the Constitution of the United States. If the contract is made without the jurisdiction of the United States, its enforcement within that jurisdiction is matter of comity, not of right. It is undoubtedly true that a contract, valid where made, is valid everywhere ; but to this rule there is an universally recognized exception, that no sovereignty will enforce within its jurisdiction a contract offensive to its laws, violative of its policy, or injurious to its own interests or those of its own subjects, or, speaking more properly here, its own citizens. Story's Confl. Laws, § 244. The enforcement of such contracts, in the jurisdiction of the sovereignty whose laws they offend, or whose policy they violate, because they were made in a sovereignty whose laws and policy they did not oppose, would be, *pro hac vice*, an abdication of its own sovereignty and independence, and the recognition as superior of the sovereignty and independence of another, which could not be possibly more than coequal. Therefore, it is not material,

[Milner v. Patton.]

in the consideration of this question, to inquire into the character imputed to the governments existing here during the war. They were certainly, in every legal and constitutional sense, foreign to the government of the United States; and if the validity of contracts, made under their dominion, is tested by the principles which would be applied if they had been made in Great Britain or France, the full measure of legal right is accorded to the citizen.

The precise question this record presents is the validity of a contract made in aid of the military forces of the Confederate States. The validity of such contracts is matter of general interest to the people of ten states. It is also a matter rather of federal than of state law and policy. Uniformity of judicial decision, on the question, is of the highest importance. It lies within the province of the Supeme Court of the United States, finally to adjudicate and determine the question; and when that court has determined it, the duty of state courts is obedience. Otherwise, there would be diverse decisions, tinged it may be by local passion, prejudice, and interest. It was said by the late Chief Justice WALKER, in reference to a kindred question: " If the Supreme Court of the United States had so held, we would promptly yield to its authority and reverse our rulings on this subject." *Scheible* v. *Bacho*, 41 Ala. 432. And this court has uniformly avowed its purpose to yield obedience to the decisions of the Supreme Court, on questions growing out of the recent war.

The question now presented has been determined by the Supreme Court of the United States, in the case of *Hananer* v. *Doane* (12 Wall. 342), in which it is expressly declared that no action will lie for the price of goods sold in aid of the military forces of the Confederate States, and that mere knowledge on the part of the seller, of the purposes to which they were to be applied, stamps invalidity on the contract. This decision is in accordance with the case of *Shepherd* v. *Reese*, *supra*, in which it was held by this court, under its former organization (Mr. Justice JUDGE delivering the opinion), that there could be no recovery on a promissory note given for a horse, purchased to be used in the military service of the Confederate States, and to it we must yield obedience. The case of *Thedford* v. *McClintock*, at the January Term, 1872 (47 Ala. 647), is not in accordance with it, and is overruled. If the appellants sold the goods to the appellee with a knowledge that they were purchased to be used for uniforming and clothing soldiers who had engaged, or were to engage, in the war against the United States, they are not entitled to recover. If they had not such knowledge, they are entitled to recover. Mere knowledge on their part of the illegal purpose for which the goods

were purchased is all the law requires, to pronounce judgment against the contract. This is the rigid rule of the common law, from which there should be no departure. "The landlord who lets lodgings to a woman, knowingly permits her to carry on the trade of prostitution under his roof, and does not take the earliest opportunity of evicting her, and putting a stop to her trade, the courts will give him no assistance for the recovery of his rent." Add. on Con. 92. No court would permit him to say he did not countenance the prostitution; that his only purpose was to rent his premises. The man who, at the gaming table, lends another money to be used in betting, bars himself from all right of recovery. No plea that he did not game himself, and had no interest in the gaming, will avail him. He contributed the means of violating law, and encouraged vice and dissipation. The druggist, selling arsenic to another, with a knowledge that it is to be used in taking human life, would be spurned from a court of justice, if he was not committed to the criminal docket. The insurer effecting an insurance on the enemy's goods in time of war cannot, on the return of peace, approach a court of justice and demand a recovery of premiums, nor can the insured demand compensation for the loss. Neither would be heard to say that his motive was only the transaction of ordinary business. The seller of goods to be used in aid of the military service of the Confederate States, having knowledge of the purpose to which they were to be applied, cannot be allowed to say he had no purpose to violate the law, that his only purpose was a sale of the goods, and that the plying of his trade, or the gratification of his avarice, was superior to his care and reverence for the Constitution, laws, and policy of the United States.

The Circuit Court did not therefore err, in refusing the charge requested by the appellants, but did err in the charge given. The charge given would have precluded the appellants from a recovery, though they may have had no knowledge of the illegal purpose for which the goods were purchased. This is not correct. The appellants must be chargeable with such knowledge, and bare knowledge on their part avoids the contract.

For the error in the charge given, the judgment of the court below is reversed, and the cause remanded.

B. F. SAFFOLD, J. — I dissent from the proposition of the court, that a contract for the sale of goods is vitiated, because the vendor was simply aware, at the time, of an intention on the part of the vendee to use them in the military service of the Confederate States. The plaintiffs (appellants) claimed of the defendant appellee $2,350 due by account for goods sold in October, 1861. The defendant pleaded, amongst other

defences, that the goods were purchased for the purpose of clothing and uniforming Confederate soldiers, with the knowledge and intention of such use, on the part of the plaintiffs. A replication denied the intention attributed to the plaintiffs. The court charged, that the alleged purpose of the defendant, if proved, would alone defeat a recovery. This court holds the charge to be erroneous; but declares that the simple knowledge of the plaintiffs, of the purpose of the defendant, would forbid the maintenance of the action. Under the influence of this declaration, it formally overrules the decision made in *Thedford* v. *McClintock*, 47 Ala. The point of that decision was, that a sale of a horse, to one who was a Confederate lieutenant, was not invalid, because the vendor knew of his intention to use it in the Confederate military service, unless he also had a like intention or purpose.

No more potent reason can be given why courts refuse to adjudicate between the parties to illegal transactions, than that the state cannot afford to maintain tribunals of justice to settle the disputes of criminals, and to dignify them with its consideration, to the demoralization of the people. In the very execution of this principle, it does deign, in some instances, to take cognizance, through its courts, of such cases, when the parties are not *in pari delicto*.

Is it the law, that a sale valid and lawful in itself is vitiated by the mere knowledge of the vendor that the purchaser intends to make an illegal use of the property? I do not so construe *Hananer* v. *Doane* (12 Wall. 342), upon which the opinion of this court is based, as by obedience. Hananer was a recognized supply contractor of the Confederate government, and the promissory notes sued on were given by him in consideration of commissary stores for the Confederate army, and due bills of his given to others, on like consideration, and taken up at his request. The transactions were with him directly as such agent, and, therefore, virtually with the Confederate government itself.

Knowledge of the illegal purpose of another is evidence of the intention with which one does an act calculated to aid him in its accomplishment. As such evidence, it is more or less strong according to circumstances; but it never can be conclusive. In *Hananer* v. *Doane*, *supra*, the intention of the payee of the *notes*, as the essence of his offence, is recognized and conceded. Justice BRADLEY says, "He who, being bound by his allegiance to a government, sells goods to *the agent* of an armed combination to overthrow that government, knowing that the purchaser buys them for that treasonable purpose, is himself guilty of treason, or a misprision of treason." He quotes from Chancellor WALWORTH in *De Groot* v. *Van Duzer*

[Milner *v.* Patton.]

(20 Wend. 390), that the "cases in which an independent contract has been held void, from a mere knowledge of the fact of the illegal end in view, proceed upon the ground, that the party having such knowledge intended to aid the illegal object at the time he made the contract." He says, if Hananer had given the notes for money borrowed to redeem his due bills, the contract would have been legal, notwithstanding the knowledge of the lender of the purpose of its application. The decision is, that promissory notes, given for goods sold to the Confederate government, through its recognized agent, for the purpose of carrying on the war against the United States, cannot be collected through the instrumentality of our courts.

In the case under our consideration, we have nothing to do with the evidence. A contract "in aid of the Rebellion" is either illegal in itself, without regard to the intention or knowledge of the parties, or it is so because of that knowledge and intention. When the contract itself is innocent, a single example to the contrary will disprove the doctrine, that knowledge merely, without evil intention, vitiates it. The illustration of Chief Justice Eyre in *Lightfoot* v. *Tenant* (1 Bos. & Pul. 551, 556), of the man who sells arsenic to one who, as he knows, intends to poison his wife with it, immediately presents the picture of an atrocious murder, and a mercenary wretch who, instead of preventing, contributed to it for the sake of the paltry price. But when it is suggested, that the purpose of the seller was the more sure prevention of the crime, by the arrest of the husband, in which he succeeded; shall we still say that he will not be allowed to maintain an action on his contract, because he knew of the wicked intention, and, by means of the sale, was enabled to frustrate it? If the assumption be pronounced far-fetched and dangerous, it is not more irrational than that the husband should tell of his purpose, and not more dangerous than a simple refusal to sell, on account of which the poison was bought elsewhere and administered.

But no better illustration can be given of the principle I contend for, than is afforded by the circumstances of the recent war. So universal was the participation in it, that every branch of industry became involved, and, perforce, contributory to it. The people had to live by their labor, as before, and the Confederate army absorbed nearly every other demand. The wife, whose husband was enlisted, found it necessary to sell her homespun and her socks to soldiers, in order that she might find bread for her children. The merchant's necessities compelled the sale of his goods to whosoever would buy. So with the manufacturer, the agriculturist, and every other producer and dealer. The United States government, in all its

action during and after the war, shrank from treating the people of the revolted states as traitors. Shall the law now pronounce an edict of excommunication against the thousands of personal contracts tinged with knowledge of aid to the Rebellion, as the atmosphere is sometimes laden with infectious disease, but which we must breathe or die? Will not concurrence of intention suffice, especially as the knowledge, in most instances, is separable from it, and could not possibly have exerted any salutary influence?

Apart from the reasons before stated, why the courts will not take cognizance of illegal contracts between the parties, it is by no means certain that their refusal to do so is the best policy. Our legislature has thought the opposite course preferable in respect to change bills issued to circulate as money. R. C. §§ 1171-73.

I think I have shown that the case of *Hananer* v. *Doane*, *supra*, only decides, that a contract made with the Confederate government, through its recognized agent, for army supplies, is, *per se*, illegal and void; and that, where the contract itself is independent and legitimate, the knowledge of one party of the evil intention of the other party is material only as it is significant, according to circumstances, of a concurrent participation at least in the wicked intention. In further proof, I cite the elaborate and discriminating review of all the leading authorities on the subject contained in *Kreiss* v. *Seligman*, 8 Barb. (N. Y.) 439; *Tracy* v. *Talmage*, 4 Kernan (14 N. Y.); *Steele* v. *Curle*, 4 Dana (Ky.), 385.

In the present case, as in *Thedford* v. *McClintock* (47 Ala. 647), the plaintiffs, admitting their knowledge or information of the purpose of the vendee, put in issue their personal contract of sale with the vendee for his own use, and their intention in making the sale. The issue is fair and legitimate, and should only be determined by the jury from the evidence. Crime, in civil as in criminal cases, has its life in the intention, and cannot be imputed. It must be proved.